Filed 2/18/26  In re K.S. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re K.S., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br> R.S., <br><br> Defendant and Appellant. | F089836 <br><br> (Super. Ct. No. 24CEJ300187-1) <br><br> **OPINION** |

## THE COURT[*]

APPEAL from orders of the Superior Court of County of Fresno, Brian M. Arax, Judge.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Douglas T. Sloan, County Counsel, and Ashley N. McGuire, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Meehan, Acting P. J., Snauffer, J. and DeSantos, J.

R.S., noncustodial father (father) of minor child K.S., appeals from the juvenile court's dispositional order declining to place K.S. with him pursuant to Welfare and Institutions Code[1] section 361.2, subdivision (a) following removal from her mother V.V. (mother). Father argues the court's finding that placement with him would be detrimental to K.S. was not supported by sufficient evidence.

Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 5, 2024, the Fresno County Department of Social Services (department) filed a juvenile dependency petition on behalf of then 15-year-old K.S., alleging she came within the juvenile court's jurisdiction under section 300, subdivision (b)(1).[2] The petition alleged mother had failed to provide adequate care, supervision and protection due to failing to protect K.S. with respect to an incident where mother's boyfriend had physically assaulted K.S., exposing K.S. to ongoing domestic violence between herself and her boyfriend, and using methamphetamine. K.S. was removed from mother's home and placed in a foster home.

Father was considered K.S.'s presumed father. K.S. requested he be assessed for placement, though she had not seen him in a couple of years. When the social worker contacted father, he requested placement of K.S. He reported he had not seen or spoken to her in about a year, but she had contacted him the night before. He explained he gave up custody of her to mother when she was a baby, thinking that mother would allow him to see her more, but he only was able to have contact with K.S. on and off over the years. Father admitted to having a history of domestic violence and having completed a

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

[2] The petition also made allegations under section 300, subdivision (g), but those were later withdrawn by the department.

2

domestic violence and child endangerment class about three years prior. He further reported that around that time, he also completed a treatment program for methamphetamine abuse and had been sober since.

At the detention hearing conducted on November 6, 2024, father requested placement. His attorney represented that father had room in his home for K.S. and had completed substance abuse rehabilitation and batterer's intervention and child abuse programs as part of a prior criminal case. County counsel was "hesitant" to recommend placement at that point as K.S. had not seen her father "in quite some time." K.S.'s counsel said that she wanted visitation with father. The juvenile court ordered supervised visitation and granted the department discretion to progress visits to unsupervised. The court ordered that K.S. remain detained from mother.

The jurisdiction report dated December 9, 2024, indicated that father had a criminal history consisting of a 2015 misdemeanor conviction for disobeying a court order (Pen. Code, § 166, subd. (a)(4)); a 2015 "wet reckless" conviction (Veh. Code, § 23103 in lieu of §§ 23152, 23103.5); and 2017 convictions for misdemeanor vandalism (Pen. Code, § 594, subd. (a)(2)), felony infliction of corporal injury on a spouse/cohabitant (*Id*., § 273.5, subd. (a)), and felony child cruelty causing possible injury or death (*Id*., § 273a, subd. (a)).

It was further reported that the family had an extensive child welfare history. In 2013, the department received a referral alleging general neglect with father as the offending party. It was reported father was using methamphetamine during visitation with K.S. and while K.S. was in his care, he called mother and threatened to kill himself. The referral was deemed inconclusive. In 2015, father reported concerns for K.S. in mother's care. He reported that K.S. told him that mother hits her too hard and she does not want to live with her. Father was concerned that mother was using drugs because he used to use with her. The referral was deemed inconclusive. Also, in 2015, mother reported to a counselor she and father had a history of domestic violence and K.S. had

3

witnessed several incidents of physical violence. Mother reported she had a restraining order against father that had recently expired, and they used a third party to exchange K.S. Mother also reported methamphetamine use while not in care of K.S. and was referred to substance abuse treatment. The referral was deemed inconclusive. Additionally, there were more recent referrals that were deemed inconclusive or evaluated out with mother as the offending party, including allegations that K.S. was not attending school, mother was not adequately supervising her, and mother was physically injuring her.

Father participated in an initial interview with the social worker and stated he was single, did not have any other children besides K.S., and lived with his mentally impaired aunt in a home that belonged to his mother. He did not pay rent but helped care for his aunt and mowed lawns for money. His support system included his mother, and he attended church. He had never met mother's boyfriend before, and the dependency petition was the first he heard of him hurting K.S. He recalled K.S. calling him at one point and hearing mother and the boyfriend fighting in the background and the boyfriend "telling [K.S.] stuff as well." He encouraged K.S. to call law enforcement, but she did not. He saw K.S. about three to four months before the dependency proceedings were initiated. He had allowed mother to obtain custody of K.S. because he was young and did not realize she would not allow him to continue seeing her.

Father admitted to having a history of domestic violence with an old girlfriend about three to four years prior. He asserted he was not physically abusive, "only verbally abusive." He reported never being incarcerated and having no active criminal protective orders or restraining orders. He said he currently smoked marijuana but used methamphetamine from when he was 12 years old up to four or five years ago. He reported taking a class through Teen Challenge that helped him think about the consequences of his actions and a year-long child abuse class.

4

Father's voluntary case plan consisted of visitation, attendance of the concurrent planning orientation, parenting classes, a substance use disorder evaluation, random drug testing, a domestic violence inventory, and a mental health assessment. At the time the jurisdiction report was written, he had attended the concurrent planning orientation, was placed on a waiting list of parenting classes, and failed to attend the substance use disorder evaluation and domestic violence inventory. He was in the process of scheduling a mental health assessment. On December 4, 2024, he told the social worker that he did not want to participate in services because it was all new to him and he did not want to stress himself out. He expressed frustration that the services were not court-ordered.

At the jurisdiction hearing conducted on December 11, 2024, the juvenile court sustained the dependency petition and found K.S. to be described by section 300, subdivision (b). The court granted the department discretion to progress father's visits up to liberal.

In its disposition report dated January 14, 2025, the department recommended K.S. be adjudged a dependent of the juvenile court and remain in foster care with both parents participating in family reunification services. The department opined that placement with father would be detrimental based on father's history of methamphetamine use, past domestic violence, current marijuana use, lack of participation in voluntary services, and lack of involvement in K.S.'s life. As for his voluntary case plan, father expressed he did not want to drug test because he would test positive though the social worker encouraged him to enroll to show that his levels were decreasing. Father attended a mental health assessment and did not meet medical necessity and was not recommended treatment. He also continued visiting with K.S. The visits went well, and K.S. reported enjoying them.

At the hearing initially set for disposition, conducted on February 5, 2025, K.S.'s attorney stated that K.S. felt she and father had a strong relationship, and she wanted to

5

be placed with him. The juvenile court continued the hearing at the department's request for Indian Child Welfare Act of 1978's (25 U.S.C. § 1901 et seq.) inquiry but made extensive comments as to potential placement with father. The court expressed concerns that father had prior criminal history, had not previously kept up with what was going on with K.S.'s life, had a domestic violence history with some minimization of verbal abuse, did not live independently, and had "[a]ncient, but bigtime serious scary drug use." The court granted the department discretion to progress visits between father and K.S. to unsupervised, liberal, or extended visits and ordered the department to assess father's home and obtain more details.

In an addendum report dated April 30, 2025, the department continued to recommend K.S. remain in foster care. The department reported that father had started parenting classes but was dropped due to excessive absences. He also participated in a substance abuse orientation where he reported marijuana being his drug of choice, with daily use. He further reported first using methamphetamine at age 12 with daily use and that he last used in December 2024. He had completed the residential Teen Challenge program for methamphetamine in 2022. He also denied past alcohol use. As a result of the assessment, father was advised to enroll in random drug testing and was referred to substance abuse services. Father did not attend his intake appointment, was reminded to reschedule, and failed to do so.

At a "Child and Family Team" meeting in April 2025, father expressed that he wanted to attend the year-long Teen Challenge substance abuse program because it is faith based. He wanted K.S. to be placed with the paternal grandmother while he was in the program. Father was advised to let the social worker know when he would be entering treatment and to complete a release of information to allow the social worker to communicate with the program. Father again reported he had not enrolled in random drug testing because he did not want to test dirty or incriminate himself. Father provided

6

the department with a certificate of completion for 52 sessions of a child abuse treatment program indicating he attended class from November 2019 to March 2021.

At the continued disposition hearing on April 30, 2025, K.S.'s attorney expressed again that K.S. was anxious to move back with father and would like to do so that day. Father was currently at third party supervised visits, and, according to the paternal grandmother, who was supervising, they were going well. The social worker represented to the juvenile court she did not have any safety concerns for K.S., and her only concern was that father had not been randomly drug testing. She had not yet assessed father's apartment. The court continued the matter, ordered K.S. and father to begin unsupervised visits, stating, it "cannot order overnight yet until we know a little bit more about sobriety and about the home."

On May 7, 2025, the juvenile court conducted the disposition hearing. No parties submitted additional evidence and proceeded by way of argument. K.S. requested to be placed with father on family maintenance or that she be allowed to have extended visits. Father also requested family maintenance.

Counsel for the department argued that the department was concerned about drug use because they had no proof father was currently sober. As such, they were not recommending family maintenance or an extended visit. Mother's counsel joined in the department's position.

K.S. personally addressed the juvenile court. She stated that father had been good around her. He had never drunk alcohol and had never been a bad role model. She expressed she was grateful for the proceedings because they brought the two of them together. She was doing badly before and hanging around the wrong people and now that she was visiting with father, she felt better.

In ruling, the juvenile court started by complimenting father on being direct, honest, and open. The court stated father "light[s] up the courtroom," had a "kind demeanor," "appear[ed] very sober," and had a home. The court pointed out that K.S.

7

had experienced trauma living with mother and appeared to be starting to value herself more based partly on having a relationship with father. The court described K.S. as needing someone who loves her and that it appeared she was reaching out and "glom[ming]" on to father based on that need. The court then stated it was "tempering" or balancing father's "kind" and "earnest" qualities against K.S.'s needs. The court said father had "things happening in [his] life that prevented [him] from being the dad [he] wanted to be," noting it was not "excus[ing]" that but understood and again praised father for his positive qualities, including attending court and cooperating with the department.

The juvenile court went on to say that K.S. had suffered physical abuse, witnessed domestic violence, and for those reasons, was a "handle-with-care person." The court acknowledged that father had had "those issues in the past" but had been treated for them. The court stated it was not presuming father still had those issues, and it was not "a particular worry or concern" of the court's but emphasized that it was a "serious past that involved a lot of treatment" and that domestic violence and drug use were often related. As for drug use, the juvenile court remarked K.S. had been around drug use and "had been experiencing that sort of instability and problem" in mother's home. The court noted it was "not sure" if it was seeing "manifestations" of drug use by father and that father did not participate in substance abuse services. The court explained it was not considering that failure to participate in voluntary services in its determination, "[b]ut I have this complication even without the offer of services." The court noted father had completed the Teen Challenge program in 2022 but had used methamphetamine since completing that treatment program relatively recently.

The juvenile court explained, addressing father, "You don't need to be sober to care for [K.S.], and it's less sober you need to be and she's older and she can take care of herself or report." The court went on, "But if we're assessing you as to whether you're safe under these circumstances for what she's experienced at this moment, drug use and abuse history, use after treatment, then recent; and you seem to be sober, but I cannot feel

8

comfortable knowing that you are day to day to day or for the longer term until now I have a baseline." The court wanted assurances that father was sober given the record, "and I don't have anything else to show sobriety other than your limited appearances in court, in which you have notice as to when it's going to happen and time to prepare." The court concluded that given K.S.'s experiences, it did not feel comfortable that father was "in a place where it's safe to give [him] custody" "for the longer term." The court added that the record showed that father did not keep up with what was happening in K.S.'s life and showed a lack of protectiveness in that way.

The juvenile court adjudged K.S. a dependent of the court, removed her from mother's custody, and denied father's request for custody. The court found by clear and convincing evidence that placement with father would be detrimental based on the above reasons and "the whole record," including "his failure to be there for his child during the time of her need, which is fairly recent, as well." The parents were granted reunification services. The court ordered father to have liberal visitation to consist of weekends.

## DISCUSSION

Pursuant to section 361.2, subdivision (a), when the juvenile court orders removal of a child from their custodial parent, and a previously noncustodial parent requests custody, "the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." The court's detriment finding must be made by clear and convincing evidence, and in making the finding, "the court weighs all relevant factors to determine if the child will suffer net harm." (*In re A.C.* (2020) 54 Cal.App.5th 38, 43 (*A.C.*).)

We review the court's detriment finding for substantial evidence. We review the entire record in the light most favorable to the court's order, keeping in mind the clear and convincing standard of proof. (*A.C.*, *supra*, 54 Cal.App.5th at p. 43; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

9

We conclude the juvenile court's detriment finding was supported by substantial evidence. Father had a long history of methamphetamine abuse. It appears methamphetamine use may have contributed to father's past domestic violence/child abuse, as his attorney represented he initially attended treatment as part of his criminal domestic violence case. Though father stated he had successfully completed a treatment program and had been sober for approximately three years, he also admitted to methamphetamine use as recent as December 2024, admitted he would benefit from a year-long residential substance abuse program, and declined to drug test for fear of it being positive. We acknowledge father was not court ordered to drug test, but his failure to do so and the reasons he gave given his history gave the court reason to be concerned about current drug use.

While the foregoing may not rise to the level of detriment needed to deny placement with a noncustodial parent in every case, in this particular case, the juvenile court correctly evaluated father's circumstances in the context of K.S.'s unique needs. The court recognized that she had lived an unstable life in mother's custody and had suffered effects of methamphetamine use by both mother and mother's boyfriend, which resulted in neglect and physical harm. Given that K.S. and father had somewhat sporadic contact over the year, she got very attached to him through visitation during the dependency proceedings. The court interpreted this as K.S. "glom[ming] on" to the stability that K.S. wanted and needed father to provide. The risk that father was not sober from methamphetamine, which the court described as "strong" and "huge" may not have been a large concern for K.S.'s physical safety given her age, but the court could reasonably find this risk posed detriment to K.S.'s emotional well-being. (See *A.C.*, *supra*, 54 Cal.App.5th at p. 46 ["the court's inquiry properly is more comprehensive than simply whether a child will be physically safe with a noncustodial parent or whether that parent has behaved badly"]; see also *In re C.C.* (2009) 172 Cal.App.4th 1481, 1490–1491 [court has broad discretion to evaluate child's emotional well-being; finding a placement

10

would impair the child's emotional security may suffice in appropriate cases].) K.S.'s experience with mother and mother's boyfriend's methamphetamine abuse and domestic violence and her attachment to father in a supervised visit setting put her in a unique need for a sober care provider in father.

We reject father's suggestion that the juvenile court appeared to place the burden on father to show he was a safe parent. Father downplays the evidence showing he had a current substance abuse problem, evidenced by his long history, recent admitted use, repeated statements that he would test dirty, and his indication he wanted to enter residential drug treatment but failure to take concrete steps to do so. The court would have been remiss to ignore this evidence, including that even though father was not court-ordered to complete any services, including drug testing, father specifically declined to drug test due to his statement the tests would come back positive.

Father also repeatedly focuses on the juvenile court's statements that he appeared sober. The court, however, emphasized that while father "appear[ed]" sober in court, he had notice of the hearings and therefore time to prepare. The court expressed significant concern that father was *not* sober *despite* his appearances based on the evidence before the court and that there was no demonstrative proof that he was sober against that backdrop. This was reasonable.

Finally, father comments that the juvenile court "did not think he was truly a risk" given its orders increasing visitation. We disagree. The court made extensive comments expressing concern about its dispositional liberal visitation orders, stating, "I don't think I've ever done this, and I'm not sure I would ever do it again," that it "may be inappropriate," and that it was "going to stretch and reach and take some risk here." The court further stated it was concerned K.S. might "not fully report everything and fudge," and that father's risk of not being sober was "huge" and "presents that realistic possibility to clear and convincing evidence that she would be at risk in that sort of environment for an extended period of time." These comments indicate to us that the court was willing,

11

albeit hesitantly, to allow significant unsupervised contact for short periods while still finding that full-time placement posed a significant risk to K.S.

For the foregoing reasons, we conclude the juvenile court's detriment finding under section 361.2, subdivision (a) was supported by substantial evidence, and it therefore did not err by denying father placement of K.S. at the disposition hearing.

## **<u>DISPOSITION</u>**

The juvenile court's dispositional findings and orders are affirmed.